### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:12CV905SNLJ** |
| | ) | |
| **ST. LOUIS UNIVERSITY SCHOOL** | ) | |
| **OF MEDICINE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM

Plaintiff has filed this multicount count action for disability discrimination and breach of contract alleging that defendant St. Louis University School of Medicine (hereinafter referred to as "SLU") failed to accommodate his disabilities regarding the taking of a third-party administered medical board examination, and ultimately, dismissing plaintiff from its medical school program. Plaintiff asserts claims against SLU under Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 *et. seq.* and the Rehabilitation Act of 1973 (RHA), 29 U.S.C. §794 *et. seq.* (Counts I-IV); as well as a Missouri state-law claim for breach of contract (Count V). Essentially, plaintiff contends that SLU has failed to accommodate his disabilities by refusing to permit him to stay enrolled in the medical school and/or provide him with an unspecified extended period of time in which he can pursue "accommodations" from a third-party regarding the administration of a medical board examination.  This matter is before the Court on SLU's 12(b)(6) motion to dismiss [9], filed July 12, 2012.  All responsive pleadings have now been filed and this matter is ripe for disposition.

The purpose of a Rule 12(b)(6) motion to dismiss is to test the legal sufficiency of a complaint so as to eliminate those actions "which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." Young v. City of St. Charles, 244 F.3d. 623, 627 (8th Cir. 2001) *quoting* Neitzke v. Williams, 490 U.S. 319, 326-27 (1989).  A complaint must be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 570 (2007)(abrogating the prior "no set of facts" standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  Courts "do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Id., 550 U.S. at 555.  A complaint must set forth factual allegations which are enough to "raise a right to relief above the speculative level." Id., 550 U.S. at 555.  However, where a court can infer from those factual allegations no more than a "mere possibility of misconduct", the complaint must be dismissed.  Cole v. Homier Distributing Co., Inc., 599 F.3d. 856, 861 (8th Cir. 2010)(*citing* Ashcroft v. Iqbal,  - U.S. -, 129 S.Ct. 1937. 1950 (2009)).

In passing on a motion to dismiss, a court must view the allegations of the complaint in the light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232 (1974); Kottschade v. City of Rochester, 319 F.3d. 1038, 1040 (8th Cir. 2003).  While a complaint challenged by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff must still provide the grounds for relief, and neither "labels and conclusions" nor "a formulaic recitation of the elements of a cause of action" will suffice. Bell Atlantic Corp. v. Twombly, 550 U.S. at 555.(internal citations omitted).  "Although the pleading standard is liberal, the plaintiff must allege facts – not mere legal conclusions – that, if true, would support the existence of the claimed torts."

Moses.com Securities v. Comprehensive Software Systems, Inc., 406 F.3d. 1052, 1062 (8th Cir. 2005) *citing* Schaller Tel. Co. v. Golden Sky Systems, 298 F.3d. 736, 740 (8th Cir. 2002). In viewing the complaint in the light most favorable to the plaintiff, the court should not dismiss it merely because the court doubts that the plaintiff will be able to prove all of the necessary allegations. Bennett v. Berg, 685 F.2d. 1053, 1058 (8th Cir. 1982). The primary issue for a court to consider is not whether the plaintiff will ultimately prevail in the lawsuit, but whether the complaint adequately states a claim; and therefore, the plaintiff is entitled to present evidence in support of that claim. A complaint may not be dismissed based upon a district court's assessment that the plaintiff will fail to present evidentiary support for the complaint's allegations or will ultimately fail to prove one or more claims to the satisfaction of the factfinder. Bell Atlantic Corp. v. Twombly, 550 U.S. at 556; Neitzke v. Williams, 490 U.S. at 327 ("What Rule 12(b)(6) does not countenance are dismissals based upon a judge's disbelief of a complaint's factual allegations."). However, "[w]here the allegations show on the face of the complaint there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is appropriate." Benton v. Merrill Lynch & Co., 524 F.3d. 866, 870 (8th Cir. 208). Further, courts "'are not bound to accept as true a legal conclusion couched as a factual allegation.'" Ashcroft v. Iqbal,  - U.S. -, 129 S.Ct. 1937. 1950 (2009)(*quoting* Twombly, 550 U.S. at 555). When considering a motion to dismiss, a court can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Ashcroft v. Iqbal, 129 S.Ct. at 1950. Legal conclusions must be supported by factual allegations to survive a motion to dismiss. Ashcroft v. Iqbal, 129 S.Ct. at 1950. With this plausibility standard in mind, this Court turns to an examination of the plaintiff's complaint.

In his complaint, plaintiff first sets out his "pre-medical school" education and his difficulties with completing time-pressured examinations (timed tests).  Following graduation from Pennsylvania State University in the spring of 2000, plaintiff took the MCAT[1] twice, scoring poorly both times due to his struggles in complying with the MCAT's time standards..

In the fall of 2000 plaintiff attended and completed a one (1) year graduate health sciences program at Georgetown University.  Upon completion of the Georgetown program, plaintiff entered a medical school preparatory program at SLU.  He completed this program in the spring of 2002.

Given his successful completion of the Georgetown and SLU pre-medical school programs, and despite his poor MCAT scores, plaintiff was accepted into St. Louis University Medical School in the summer of 2002.

Plaintiff began the SLU medical school program in the fall of 2002.  He completed all of his Year 1 and Year 2 coursework successfully.  Most of his classes during this time did not have strict "timed tests"; however, he struggled with his Anatomy class due to timed tests.

At the conclusion of Year 2, plaintiff (as did all Year 2 medical students) was required to take the USMLE (United States Medical School Licensing Exam), Step I in September 2004.  All USMLE tests are administered by the National Board of Medical Examiners (NBME), a national non-profit organization that provides standard nationwide testing for educational evaluation and licensure for medical professionals. The USMLE, Step I test is a comprehensive, strictly timed test.  "It is composed of three parts, or steps, and most medical schools in the United States require their students to pass Step I before advancing to the third-year medical school curriculum.

---

[1]Medical College Admissions Test (MCAT) is a standardized timed-test required for admission to most U.S. medical schools.  It is administrated by the Association of American Medical Colleges.

Further, in all United States jurisdictions, passage of all three steps of the medical licensing

examination is mandated in order to satisfy state licensing requirements to become a doctor.".

Powell v. National Board of Medical Examiners, et. al., 364 F.3d. 79, 82 (2nd Cir. 2004), as

corrected, 511 F.3d. 238 (2nd Cir. 2004).

Plaintiff struggled with the taking of the USMLE, Step I test and ultimately failed it.  He

received his failing score approximately one (1) week before his next scheduled timed NBME

exam - the "shelf" exam (final exam) for OB/GYN.  Although plaintiff did well in his OB/GYN

rotation, he failed the OB/GYN shelf exam.  He was given a temporary "D" (deferred) grade by

SLU, pending his retake of the OB/GYN shelf exam. Plaintiff retook the OB/GYN shelf exam

two (2) more times, in 2004 and 2006, but failed both times.

Meanwhile, plaintiff was required by the Student Progress and Program Planning

Committee (SPPPC) at SLU to take a mandatory three (3) months leave of absence to prepare for

retaking the USMLE, Step I.  Plaintiff had a deadline of January 31, 2005 to sit for a second

attempt at the USMLE, Step I.

Plaintiff took the USMLE, Step I a second time, and failed again.  Due to this second

failed attempt at passing the USMLE, Step I, plaintiff was required to meet with the SPPPC.  He

was placed on another leave of absence for an additional six (6) months to prepare to take the

USMLE, Step I for a third time.

The SPPPC provided general test-taking assistance; however, plaintiff decided to take a

four-week USMLE, Step I preparatory course in Champaign, Illinois.  He not only took the

course, but also remained there for an extra four (4) weeks to focus on his test-taking skills.

Unfortunately, plaintiff failed again at his third attempt to pass the USMLE, Step I.

After some consideration, the SPPPC gave the plaintiff another six (6) months leave of absence to allow him to prepare again to take the USMLE, Step I for a fourth time.  Plaintiff enrolled in another preparatory course, and passed the USMLE, Step I at his fourth attempt.

Despite his leaves of absences, and multiple attempts at passing the USMLE, Step I, SLU cleared the plaintiff to start his third year of medical school in the fall of 2006.

Plaintiff struggled a bit with his third-year course work; yet, managed to pass most of his interim NBME shelf exams.  However, he failed his NBME Neurology shelf exam. After failing the NBME Neurology shelf exam, plaintiff met with the SPPPC in January/February 2007. The SPPPC told plaintiff he could finish his Pediatrics rotation, but that he would need to retake not only the NBME Neurology shelf exam, but also the OB/GYN shelf exam.

Plaintiff successfully completed his Pediatrics rotation, but failed the NBME Pediatrics shelf exam.

In the spring of 2007, plaintiff successfully completed his four (4)-week rotation in Neuro-ophthalmology, and his four (4)-week rotation in Clinical Ophthalmology.  Neither of these courses had a shelf examinations at their conclusions.

Plaintiff successfully completed his Psychiatry rotation, but again, failed the NBME Psychiatry shelf exam.

As of fall 2007, plaintiff had failed four (4) NBME shelf exams in OB/GYN, Neurology, Pediatrics, and Psychiatry; and had received a temporary "D" in all four of these courses due to the failed shelf exams.

Plaintiff again met with the SPPPC and was instructed that he had to retake and pass all four of these NBME shelf exams in order to progress.  Furthermore, he had to wait and get a passing grade on each shelf exam before scheduling the next shelf exam.  Normally, it takes

approximately 3-4 weeks to schedule a shelf exam, then another 3-4 weeks to receive a grade back from the NBME.

In January 2008 plaintiff took his NBME Neurology shelf exam, and received his passing grade in February 2008.

In March 2008 plaintiff took and failed again his NBME Pediatrics shelf exam. Due to this failed retaken shelf exam, plaintiff's "D" in Pediatrics was converted to a "F".

In April 2008, plaintiff again met with the SPPPC who recommended that plaintiff seek further assistance from "test-taking strategists". Plaintiff, believing that this was not particularly helpful to him, decided to seek a psychological evaluation. This was the first time plaintiff had ever sought a psychological evaluation in connection with his test-taking difficulties. He was evaluated but found not to have any particular psychological disorder.

Plaintiff passed his NBME Psychiatry shelf exam in the fall of 2008. Meanwhile, he successfully completed three (3)-week rotations in Radiology and Neuropathology in 2008.

In February 2009, plaintiff again took and failed his NBME OB/GYN shelf exam. This cause his prior temporary "D" grade to be converted to a "F" grade. Two "F" grades are grounds for dismissal for the SLU School of Medicine.

The Chair of SLU's Pediatric's Department (Dr. Noffsinger) suggested to plaintiff that he obtain an evaluation geared specifically toward reading disorders, including ADHD[2]. Plaintiff met with the SPPPC and apprised them of Dr. Noffsinger's advice. The SPPPC heeded Dr. Noffsinger's advice and advised plaintiff that they would await plaintiff's full evaluation before making a decision regarding his dismissal from the medical school program.

---

[2]Attention Deficit Hyperactivity Disorder.

In April 2009 plaintiff was fully evaluated by an unidentified doctor with the Washington University School of Medicine who determined that plaintiff appeared to be suffering from ADHD and dyslexia.  These results were forwarded to the SPPPC.

The SPPPC decided that it would allow plaintiff to retake the NBME OB/GYN and NBME Pediatrics shelf exams whose failures had caused the two (2) "F" grades.  The SPPPC further found that the plaintiff met the requirements for Special Testing Accommodations for all future NBME shelf exams.  These Accommodations allowed plaintiff considerable extra time in which to complete his shelf exams.  In conjunction with the retaking of the NBME OB/GYN and Pediatrics shelf exams, plaintiff formally appealed his "F" grades in these two courses.

Given the extra time Plaintiff took and passed the NBME OB/GYN shelf exam in September 2009.  His "F" grade was reversed.  However, in October 2009, even with his accommodation, plaintiff took and failed for a third time the NBME Pediatrics shelf exam.  Due to this third failed attempt at passing the NBME Pediatrics shelf exam, plaintiff was given a permanent "F" grade for the course, and required to retake the entire eight (8)-week Pediatrics rotation.

Plaintiff successfully completed the Pediatrics rotation in November/December 2009 and, with Accommodations, successfully passed the NBME Pediatrics shelf exam in January 2010.  However, his "F" grade remained.

Although plaintiff had a remaining six (6) months of electives to complete prior to the taking of the USMLE, Step II, the SPPPC decided that plaintiff had to take and pass the USMLE, Step II prior to completing his electives.  The passing of the USMLE, Step II is a requirement for graduation from SLU Medical School.

Plaintiff sought a scheduling permit and special Accommodations from the NBME in connection with taking the USMLE, Step II.  Plaintiff was warned by SLU personnel that Accommodations for taking the USMLE, Step II were rarely given by the NBME, and that SLU would not waive its academic requirements for the plaintiff while he sought his Accommodations from the NBME.  Plaintiff was denied his request for special Accommodations from the NBME as to the taking of the USMLE, Step II.

Plaintiff took the May 2010 USMLE, Step II without any Accommodations being given by the NBME; and failed the test.  Plaintiff took the USMLE, Step II again in October 2010 without securing any Accommodations from the NBME, and failed the test.  Plaintiff took the USMLE, Step II for the third time in March 2011 without any special Accommodations being granted by the NBME, and he failed for the third time.

In May 2011 the SPPPC decided to recommend plaintiff to the Dean of the Medical School for dismissal.  Plaintiff protested the dismissal recommendation, arguing that extenuating circumstances interfered with his taking of the USMLE, Step II. Upon the Dean's admonition, the SPPPC held a special meeting to hear and consider the plaintiff's protest of his dismissal.  The SPPPC did not reverse their prior recommendation of dismissal.

Plaintiff was notified of the SPPPC's decision to uphold its earlier recommendation of dismissal in June 2011.  Plaintiff again appealed this recommendation to the Dean.  In July 2011, plaintiff's appeal of the dismissal recommendation was denied by the Dean.

Pursuant to the NBME's regulations, plaintiff is ineligible to retake the USMLE, Step II for a fourth time because he is not enrolled in a medical school.[3]

---

[3]Plaintiff's Complaint [1], ¶¶1-80.

Plaintiff avers that following his diagnosis of ADHD and dyslexia, following SLU's advice to get a thorough psychological exam, "[B]ased on this determination, SLU provided a series of testing Accommodations which were utilized by Plaintiff and which assisted him in completing his examination requirements.".  Plaintiff's Complaint [1], ¶101.

Plaintiff contends that SLU's decision to dismiss him from its medical school based upon his repeated failures to pass the NBME, Step II while knowing that the NBME has refused to provide plaintiff with requested testing Accommodations, is in and of itself a failure to provide the plaintiff with a reasonable accommodation.  Plaintiff's Complaint [1], ¶104.  Plaintiff concedes that he is seeking a "modification" of SLU's enrollment policies; and that although "SLU applied its standard enrollment policies to the consequences of a NBME test" it did so knowing that the NBME had failed to provide its own testing Accommodations to the plaintiff; therefore, SLU failed to provide the plaintiff with equal access to SLU's services.  Plaintiff's Complaint [1], ¶¶111, 113.

Finally, plaintiff alleges that he enrolled in and attended medical school with the reasonable expectation that SLU would adhere to all laws pertaining to the accommodation of disabilities. Plaintiff's Complaint [1], ¶131.  He further alleges that as "consideration for attendance and participation in medical school at Defendant SLU, the plaintiff paid tuition, purchased books and supplies, and spent time and effort in his studies.".  Plaintiff's Complaint [1], ¶132.  Finally, plaintiff alleges that "[p]ursuant to a written contract with SLU, the Plaintiff has given up the right to seek employment while enrolled at SLU and has agreed to concentrate on his studies, and the contract has express and implied provisions requiring Defendant SLU to abide by laws pertaining

to physical disabilities and to assist and accommodate the Plaintiff, and a covenant of good faith and fair dealing.".  Plaintiff's Complaint [1], ¶133.[4]

Defendant SLU argues that the plaintiff has failed to make any claim upon which relief can be granted because the "accommodation(s)" sought by the plaintiff from SLU are unreasonable as a matter of law.  SLU contends that, as a matter of law, it is not required to modify or alter its academic requirements to permit the plaintiff to remain enrolled indefinitely so as to provide him with an unspecified amount of time to seek testing Accommodations from a third-party (NBME) and/or retake the USMLE, Step II an unspecified number of times until such time plaintiff passes it (with or without Accommodations from the NBME). Furthermore, SLU argues that the Accommodations sought from SLU have no relationship to plaintiff's alleged disabilities.  They do not have any connection to plaintiff's test-taking problems at SLU.  SLU further contends that plaintiff has failed to state a claim for breach of contract because he has failed to state with any specificity the terms of the alleged contract.  Finally, SLU contends that plaintiff's breach of contract claim fails because SLU's alleged promise to adhere to all applicable laws concerning accommodation of disabilities fails as consideration for any alleged contract because a promise to perform a pre-existing legal duty does not constitute consideration and cannot give rise to an enforceable contract under Missouri law.

Plaintiff concedes that his federal claims are all based upon his fundamental problem in connection with taking the USMLE, Step II as administered by the NBME.  However, he insists that SLU should have made two (2) "reasonable Accommodations" in order to assist plaintiff with

---

[4]The Court takes judicial notice of the fact that no written contract between plaintiff and SLU or any document purporting to set forth any contractual obligations between the parties is attached to the Complaint; nor has been presented to the Court as an exhibit in connection with the instant motion.

his NBME dispute: 1) in 2010, SLU should have given plaintiff additional calendar time for an unspecified duration so as to enable the plaintiff to continue pursuing Accommodations from the NBME while he continued making attempts to pass the USMLE, Step II and/or pursue litigation against the NBME if necessary; and 2) to reenroll plaintiff so as to enable his to register again for the USMLE, Step II and to continue pursuing testing Accommodations from the NBME for an unspecified duration of time, including time for possible litigation against the NBME. Essentially, plaintiff wants a waiver of SLU's academic policies, including its educational progression timetable in the medical school because he believes this accommodation "is needed to permit Plaintiff to pursue accommodations with NBME.". Plaintiff's Response[16], pg. 9. Finally, plaintiff (for the first time) asserts that his breach of contract claim is based upon an "oral contract" and unspecified provisions in a "student handbook". He contends that the "essence" of his contract claim is SLU's "failure to act fairly and in good faith in its contractual dealings with Plaintiff by fulfilling its duty to assist him in vindicating his rights against NBME (and/or by merely permitting him to pursue the vindication of his rights).". Plaintiff's Response [16], pg. 12.

After careful consideration of the matter, including all relevant caselaw, the Court finds that plaintiff has failed to state a claim for relief in connection with his ADA and Rehabilitation Act failure to accommodate claims; as well as his Missouri state-law claim for breach of contract.

## ADA and Rehabilitation Act - failure to accommodate

Plaintiff alleges that the defendant has failed to provide him with reasonable Accommodations for his disabilities in violation of Title III of the ADA and the Rehabilitation Act.

Title III of the ADA prohibits places of public Accommodations, including undergraduate and/or postgraduate schools such as defendant SLU, from discriminating against individuals with

12

disabilities "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" they offer.  42 U.S.C. §12182(a); <u>Argenyi v. Creighton University, et. al.</u>, 703 F.3d. 441, 448 (8th Cir. 2013); <u>Mershon v. St. Louis University</u>, 442 F.3d. 1069, 1076 (8th Cir. 2006).  "Discrimination under Title III specifically includes the failure to make reasonable modifications in policies, practices, or procedure to accommodate a disabled individual, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of the services.".  <u>Mershon</u>, at 1076 *citing* 42 U.S.C. §12182(b)(2)(A)(ii).

The Rehabilitation Act is similar to the ADA in so far it requires that institutions that receive federal funding, such as defendant SLU, provide an "otherwise qualified handicapped individual" with "meaningful access" to the benefit that the grantee provides. <u>Alexander v. Choate</u>, 469 U.S. 287 (1985);  <u>Argenyi</u>, at 448-49; <u>Mershon</u>, at 1076.  The Eighth Circuit has held that the Rehabilitation Act requires a private medical school to provide "reasonable accommodations . . . when a disabled student would otherwise be denied meaningful access to a university.".  <u>Stern v. Univ. of Osteopathic Med. & Health Sciences</u>, 220 F.3d. 906, 908 (8th Cir. 2000).

Although both the ADA and the Rehabilitation Act have "Accommodations" mandates, neither require institutions to provide all requested auxiliary aids and services.

> "Basic qualifications come into play, however, when the context is that of post-secondary education.  In this context, the "otherwise qualified" idea is implicit in Title III's acknowledgment, noted above, that requested modifications need not be provided if they will fundamentally alter the nature of the program . . . It is beyond question that it would fundamentally alter the nature of a graduate program to require the admission of a disabled student who cannot, with reasonable accommodations, otherwise meet the academic standards of the program.  An educational institution is not required by the Rehabilitation Act or the ADA to lower its academic standards for a professional degree."

Mershon, at 1076; *see also*, Halpern v. Wake Forest University Health Sciences, 669 F.3d. 454, 464 (4th Cir. 2012); Falcone v. University of Minnesota, 388 F.3d. 656, 659 (8th Cir. 2004)(Rehabilitation Act does not require an educational institution to lower its standards for a professional degree by eliminating or substantially modifying its clinical training requirements); Lipton v. New York University College of Dentistry, 865 F.Supp.2d. 403, 409 (S.D.N.Y.2012), *aff'd* 2013 WL 28292 (2nd. Cir. Jan. 3, 2013).  Furthermore, when the accommodation sought involves an academic decision, a court should defer to the institution's professional judgment as to the reasonableness of the requested accommodation.  Mershon, at 1078 *citing* Amir v. St. Louis University, 184 F.3d. 1017, 1028 (8th Cir. 1999); Falcone, at 659; *see also*, Halpern, at 463 (*citing* Amir, *supra*. and Powell, *infra*.); Powell v. National Board of Medical Examiners, et. al., 364 F.3d. 79, 88 (2nd Cir. 2004)(*errata* filed 511 F.3d. 238 (2nd Cir. 2004)(*citing* Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 225 (1985)).

Since both statutes are substantively similar in nature and contain similar "Accommodations" mandates, the Eighth Circuit treats caselaw interpreting the ADA and the Rehabilitation Act as "interchangeable".  Argenyi, at 448 *citing* Gorman v. Bartch, 152 F.3d. 907, 912 (8th Cir. 1998); Mershon, at 1076, n.4 *citing* Stern, *supra*.

In the context of postsecondary education, a plaintiff asserting a claim for failure to accommodate under Title III and/or the Rehabilitation Act must show 1) that the plaintiff is disabled and otherwise qualified academically; 2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation (for ADA purposes) and receives federal funding (for Rehabilitation Act purposes); and 3) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation.  Mershon, at 1076-77; Amir, at 1027.

14

In the instant case, there appears to be no dispute that plaintiff is disabled within the meaning of the ADA and the Rehabilitation Act, and for purposes of the instant motion, the Court will accept same.  Furthermore, it has been established by the Eighth Circuit that defendant St. Louis University is a place of public accommodation within the meaning of the ADA and receives federal funding for purposes of the Rehabilitation Act. *See*, Mershon, at 1077 *citing* Amir, at 1028.  Again, there appears to be no dispute as to this fact and the Court accepts same for purposes of the instant motion.

It is the third requirement of plaintiff Doe's *prima facie* case that must be considered in light of his allegations, and his responsive pleading.

The Eighth Circuit has established that §504 of the Rehabilitation Act and Title III of the ADA each require a defendant university/college to provide a disabled plaintiff reasonable auxiliary aids and services to afford the plaintiff "meaningful access" or an equal opportunity to gain the same benefit as the plaintiff's nondisabled peers.  Argenyi, at 449.

Firstly, plaintiff bears the burden of demonstrating that he is "otherwise qualified"; i.e. that he is able to meet all of a program's requirements in spite of his disability, with or without "reasonable accommodations".  Defendant SLU requires passage of the USMLE, Step II in order to continue the standard matriculation in its medical school.  Plaintiff does not dispute the fact that passage of the USMLE, Step II is a standard requirement, nor does he allege that other non-disabled medical students have matriculated through the medical school program and graduated without taking and passing the USMLE, Step II.  It is well-established that as a medical school, defendant SLU is not required to modify its medical program in a manner which fundamentally alters its' medical school graduation requirements. Stern, at 908; *see also*, Falcone, at 659-60 (defendant university not required to "tailor a program" in which the plaintiff could graduate

15

medical school without first establishing the ability to care for patients).  Furthermore, it is well-established that the courts generally defer to a school's professional judgment regarding a student's ability to participate and complete an academic program.   Halpern, at 463 (*citing* Amir, *supra.*); Mershon, at 1078; Powell, 364 F.3d. at 88.

The plaintiff's own complaint clearly sets out the numerous accommodations provided to the plaintiff by SLU.  He was given several leaves of absences to prepare for numerous retakes of "shelf exams" in order to continue his enrollment in the medical program; the first recommended dismissal was deferred upon advisement by SLU to get a full medical examination in order to assess whether plaintiff had a medical limitation contributing to his test-taking problems; once diagnosed with dyslexia and ADHD, plaintiff was provided with test-taking accommodations directly linked to his disabilities; and he was allowed to file a protest and formally appeal the dismissal recommendation prior to his dismissal from the medical program.  Plaintiff even admits that the SLU applied its standard enrollment policies in light of his "F" grade and repeated failures in passing the USMLE, Step II. By the plaintiff's own allegations, there is nothing to suggest that SLU did anything other than support the plaintiff in his efforts to succeed in the medical program.

Secondly, the plaintiff in his complaint, and now expanded upon in his responsive pleading, clearly seeks accommodations from SLU which are dependent upon an unspecified time-table in order for him to seek accommodations from third-party NBME; and if necessary, engage in litigation with NBME.  Essentially, plaintiff seeks to have SLU maintain plaintiff's enrollment in the medical program for possible years, while he forgoes attending classes or any other further medical training, while he pursues accommodations from the NBME, which have already been rejected.  Allowing the plaintiff to simply be enrolled in the medical program without taking classes or any further medical training while he pursues (already rejected) accommodations

from a third-party materially alters the nature of the medical program.  This type of "accommodation" has been rejected by other circuits.

In Powell, *supra.*, the plaintiff sued both the University of Connecticut School of Medicine and the National Board of Medical Examiners (NBME) regarding plaintiff's repeated failure to pass the USMLE, Step I and her ultimate dismissal from the medical program.  Plaintiff claimed that the University had discriminated against her because it failed to accommodate her disabilities (dyslexia and ADD) by requiring her continued enrollment in the medical program predicated upon her passing the USMLE, Step I.

The University had provided the plaintiff several accommodations over several years to remedy her course deficiencies and to retake the USMLE, Step I in order to continue in the medical program.  The University provided her with free tutoring, a University-paid preparatory class for the USMLE, Step I, and numerous retakes of classes and the USMLE, Step I.  The University even conditionally promoted plaintiff to the third-year curriculum subject to her passing the USMLE, Step I (after over two years of retakes).  The University finally dismissed her from the medical program in 1997 when she failed the USMLE, Step I after several retakes starting in 1994.

The Second Circuit Court of Appeals held that "[I]t was well within UConn's authority to decide that in order for it to adhere to the demanding standards of a medical school responsible for producing competent physicians, it needed to require plaintiff to pass Step I.  The accommodation requested by plaintiff, that she be allowed to continue in the program without first passing Step I, would have changed the nature and substance of UConn's program."  Powell, at 88.  The Court determined that UConn's "genuinely academic decision" should be accorded

17

"great deference" and found that the requested accommodation was unreasonable under the ADA and the Rehabilitation Act.  Powell, at 88.

In Lipton, *supra.*, a dental student sued the New York University College of Dentistry alleging violations of the ADA and Rehabilitation Act in dismissing him from the dental program. Plaintiff contended that the University failed to accommodate his disability (an unspecified reading disorder which hindered his timed test-taking) by dismissing him from the dental program after he failed for the fourth time a standardized dental board exam.

Plaintiff began the dental program in 2000 but was dismissed due to his inability to successfully complete his first academic year.  He successfully appealed the dismissal, re-enrolled, and completed his first academic year in 2002.  He successfully completed his second academic year in 2003.  Lipton, 865 F.Supp.2d. at 404.  In the summer of 2003, plaintiff began his third academic year and took Part I of the National Board Dental Examination (NBDEP1) as required for his dental degree.  He failed this first attempt at the NBDEP1.

Plaintiff took the NBDEP1 for a second time but failed again.  Meanwhile, he completed his third academic year.  Lipton, 865 F.Supp.2d. at 405.  Plaintiff began his fourth academic year in August 2005.  In May 2005 plaintiff underwent a neuropsychiatric evaluation and was allegedly diagnosed with a reading disorder which interfered with his timed test-taking skills.  Lipton, 865 F.Supp.2d. at 405.  Plaintiff sought an accommodation (a "time-and-a-half testing accommodation) from the University, it was granted, and plaintiff passed the NBDEP1 following the conclusion of his fourth academic year.  Plaintiff was granted the time-and-a-half accommodation when requested for all further tests.  Lipton, 865 F.Supp.2d. at 405.

Plaintiff completed the academic coursework for the DDS program, and was allowed to participate in the graduation ceremony in 2005.  However, he had not yet completed all of the

requirements for his degree; he still had to take and pass the NBDEP2.  Pursuant to University

policy, all dental students were required to pass the NBDEP2 to graduate with their dental

degree.  If a student takes the NBDEP2 after finishing their academic coursework, then the

student must re-matriculate for the academic year when the exam will be given.  Finally, the policy

required such students to pass the NBDEP2 within fourteen (14) months of finishing their

coursework.  Lipton, 865 F.Supp.2d. at 405.

Plaintiff Lipton then proceeded to take the NBDEP2 and fail it three (3) times between

September 2005 and April 2007.  Plaintiff was dismissed from the DDS program in May 2007 for

failing to pass the NBDEP2 within the fourteen (14) month period mandated by University policy.

Lipton, 865 F.Supp.2d. at 406.  Plaintiff appealed and was granted an additional year, until June

2008, to pass the NBDEP2 or face permanent dismissal from the DDS program.  Lipton, 865

F.Supp.2d.at 406.  Plaintiff took the exam for a fourth time in May 2008 and failed again.

Plaintiff was dismissed from the DDS program in June 2008.  Plaintiff again appealed the

dismissal but lost the appeal.

Plaintiff filed suit seeking an accommodation to-wit: 1) reinstatement in the NYUCD; 2)

retaking of the NBDEP2, without re-matriculation, an unlimited number of times over "a

reasonable period of time"; and 3) waiver of graduation requirements based on his disability,

which would enable him to retake the NBDEP2 an unlimited number of times.  Lipton, 865

F.Supp.2d. at 409-10.

The district court found that the focus of the plaintiff's requested accommodations

changed from the time allowed in which to take the actual test to time in terms of months or

years, as well as number of opportunities, to take and pass the NBDEP2.  The district court noted

that the University had already afforded plaintiff almost three (3) years beyond his projected 2005

graduation date to take the test, and he had already taken and failed the test four (4) times.  The district court found the requested accommodations to be unreasonable for a number of reasons.  Firstly, the plaintiff's requested accommodations would indefinitely extend his time to complete his graduation requirements, in defiance of established policy.  It found that the University had the right to impose a time in which its graduation requirements must be completed.  <u>Lipton</u>, 865 F.Supp.2d. at 410.  Secondly, the requested accommodations beared a "tenuous relationship" to plaintiff's disability.   "The earlier time-and-a-half accommodation clearly addressed a `reading disorder which hindered his ability to accurately read and comprehend information under time constraints.'  The accommodations now requested do not appear to deal with the time constraints referred to in the finding of disability.".  <u>Lipton</u>, 865 F.Supp.2d. at 410.  The Court further found the requested accommodations to be unreasonable because they implicated not only the plaintiff's disability but other circumstances unrelated to the disability; and well as relieving the plaintiff from paying certain fees for re-matriculation which is not related to plaintiff's disability and thus, not within the purview of the ADA and Rehabilitation Act.  <u>Lipton</u>, 865 F.Supp.2d. at 410.

The district court held that the plaintiff's complaint failed to state a valid claim under the ADA and the Rehabilitation Act.  <u>Lipton</u>, 865 F.Supp.2d. at 410-11.  On appeal, the Second Circuit Court of Appeals affirmed the district court's decision.  The Court stated:

> "We see no error in the district court's conclusion that Lipton's proposed accommodations-which simply request more opportunities to pass the NBDEP2 after having failed it four times-bear a tenuous relationship to his reading disability.  Moreover, NYUCD's refusal to create such an exception to its graduation requirements is entitled to `great deference'. [***citing* <u>Powell</u>, 364 F.3d. at 88**]".

Contrary to the plaintiff's assertions, this Court finds its sister courts' analysis, especially that of the <u>Lipton</u> Court, to be extremely instructive.  Plaintiff's disabilities hinder his timed test-taking abilities.  SLU has afforded the plaintiff numerous accommodations over several years

which were directly linked to his disabilities.  The accommodations he now seeks are similar in nature to the accommodations sought in <u>Lipton</u>, *supra*.  In his own words, plaintiff Doe seeks accommodations that are designed "for the limited purpose of applying for the Step II with accommodations" and furthermore, defendant SLU "need not provide him access to educational resources or otherwise provide services until he secures accommodations from NBME and attempts to pass the Step II exam.".  Plaintiff's Response [16], pg. 10.  Plaintiff's requested accommodations do not relate to his timed test-taking skills nor or they designed to assist him in successfully completely his coursework and shelf exams as proscribed by the SLU medical program.  Instead, plaintiff's requested accommodations demand that SLU waive its standard graduation policies, re-enroll plaintiff in the medical program but put his training on "hold" for an indeterminate amount of time, and allow plaintiff an unspecified amount of time in months or years to pursue actual test-taking accommodations from a third-party (which has already rejected said requested accommodations).  The requested accommodations from SLU clearly bear a "tenuous relationship" to plaintiff's alleged disabilities making such accommodations unreasonable.

Plaintiff's requested accommodations are "unreasonable" as a matter of law because they demand that SLU materially alter the nature of its medical program, and bear a tenuous relationship to plaintiff's alleged disabilities.  Simply put, exempting plaintiff from the USMLE, Step I I scheduling requirements in 2010 or re-enrolling the plaintiff now without requiring him to continue his coursework, while he pursues for months or years accommodations from the NBME forces SLU to materially alter its medical program for "accommodations" which have absolutely no connection to his **timed test-taking skills at SLU**.  Since the requested accommodations are

unreasonable as a matter of law, plaintiff is not "otherwise qualified" as required by the ADA and/or the Rehabilitation Act to bring this action.

Finally, the Court notes that it appears that plaintiff attempts to add credence to his legally insufficient federal claims by making vague assertions that his requested accommodations are necessary in order for him to "receive the same shot SLU gives to students without disabilities to pass that exam before being expelled".  Plaintiff's Response [16], pg. 6.  He contends that "[T]o be fair, Plaintiff should receive the same number of attempts to pass this exam that SLU offers to students without disabilities.".  Plaintiff's Response [16], pg. 10.  This assertion is baseless as a matter of law.  Plaintiff, in his complaint, clearly contends that his disabilities of dyslexia and ADHD impact his ability to take timed tests.  Plaintiff, again in his complaint, concedes that once SLU was made aware of his disabilities, he was given accommodations related to his ability to take timed tests at SLU.  His requested accommodations now change the focus from the time allowed for him to take tests administered by SLU to the time, in terms of months or years, and for the first time, number of opportunities, to take and pass a test administered by a third-party. Again, his requested accommodations have no relationship to his disabilities' impact on his test-taking skills at SLU; and speculation and conjecture as to non-disabled students being allowed "more" opportunities to attempt to pass the USMLE, Step II does not change this fact.  Plaintiff's legal conclusion that SLU has "discriminated" on the basis of disability is simply not supported by any objective factual allegation that remotely identifies a single non-disabled medical student who was allowed to remain enrolled in the medical program for months or years, not attending classes, for the sole purpose of attempting multiple times to pass the USMLE, Step II.

**Breach of Contract**

As for plaintiff's breach of contract claim, this too fails to state a claim as a matter of law.

In his complaint, plaintiff vaguely refers to a written contract between the parties. Plaintiff's Complaint [1], Count V, ¶133. He fails to provide any specific terms of this "written contract". He further contends that in consideration for SLU to abide by all laws pertaining to the accommodation of disabilities, he gave up "the right to seek employment", paid tuition, enrolled, and participated in the medical program. Plaintiff's Complaint [1], Count V, ¶¶131-133.

However, in his response to the instant motion, plaintiff broadens (essentially rewriting) his contract claim by contending that he had an "oral contract" and/or that defendant had breached the covenant of good faith and fair dealing arising from the "student handbook".

Firstly, the Court finds the plaintiff's "expansion" of his contract claim in response to the instant motion to be suspect. Even so, his new contention of the existence of an "oral contract" and his vague reference to a "student handbook" still fail to state a claim for breach of contract under Missouri law.

When addressing the plaintiff's Count V breach of contract claim, the Court is reminded to pay close attention to the United States Supreme Court's admonition that although a plaintiff need not plead specific facts, "a plaintiff's obligation to provide the `grounds' of his `entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. In other words, `[f]actual allegations must be enough to raise a right to relief above the speculative level . . .". Midwest Special Surgery, P.C. v. Anthem Ins. Companies, 2010 WL 716105, *1 (E.D.Mo. Feb. 24, 2010) quoting Twombly, 550 U.S. at 555. Again, pleadings which contain nothing more than conclusions are not entitled to the assumption of truth; and all legal conclusion must the supported by factual allegations to survive a motion to dismiss. Ashcroft v. Iqbal, 129 S.Ct. at 1950.

Under Missouri law, a breach of contract action requires a plaintiff to allege 1) the existence and terms of a valid and enforceable contract between the plaintiff and defendant; 2) the rights of the plaintiff and the obligations of the defendant under the contract; 3) breach of the contract by the defendant; and 4) damages suffered by the plaintiff due to the breach.  Holmes v. Kansas City Missouri Board of Police Commissioners, 364 S.W.3d. 614, 622 (Mo.App. 2012); Teets v. American Family Mut. Ins. Co., 272 S.W.3d. 455, 461 (Mo.App. 2008); *see also*, Cento v. Allstate Prop. & Cas. Ins. Co., 2013 WL 64752, *3 (E.D.Mo. Jan. 4, 2013)(*citing* Teets, *supra.*); Bakhtiari v. Al-Khaledy, 2011 WL 6945107, *4 (E.D.Mo. Dec. 30, 2011)(*citing* Teets, *supra.*); Midwest Special Surgery, P.C. , at *6 (*citing* Teets, *supra.*).  A party "fails to state a claim for breach of contract [if] it does not set out [the claimant's] rights or [the defendant's] obligations under the contract.".  Trotter's Corp. v. Ringleader Restaurants, Inc., 929 S.W.2d. 935, 941 (Mo.App. 1996); Cento, at *3 (*quoting* Trotter's Corp., *supra.*); Bakhtiari, at *4 (*quoting* Trotter's Corp., *supra.*); Midwest Special Surgery, at 6 (*quoting* Trotter's Corp., *supra.*).  Vague references to unspecified "agreements" are insufficient to state a claim for breach of contract.  Midwest Special Surgery, at *6; Cento, at *3 (*citing* Midwest Special Surgery, *supra.*); Bakhtiari, at *4 (*citing* Midwest Special Surgery, *supra.*).

The essential elements of a valid contract are offer, acceptance, and bargained for consideration. Miller v. Dombek, 390 S.W.3d. 204, 207 (Mo.App. 2012);  Marzette v. Anheuser-Busch, Inc., 371 S.W.3d. 49, 52 (Mo.App. 2012); Holmes, at 622 (*citing* Johnson v. McDonnell Douglas Corp., 745 S.W.2d. 661, 662 (Mo. 1988)); Doran v. Chand, 284 S.W.3d. 659, 664 (Mo.App. 2009).  "Consideration generally consists either of a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party."  Miller, at 207 (*quoting* Morrow v. Hallmark Cards, Inc., 273 S.W.3d. 15, 25 (Mo.App.2008); Marzette, at

52 (*quoting* <u>Frye v. Speedway Chevrolet Cadillac</u>, 321 S.W.3d. 429, 438 (Mo.App. 2010).  A promise to do that which a party is already legally obligated to do cannot serve as consideration for a contract.  <u>Miller</u>, at 208; <u>Doran</u>, at 665.

      In Count V, plaintiff alludes to a "written contract" but fails to provide any details whatsoever as to its terms; e.g. the parties to the contract, the date of its execution, some information regarding the rights and responsibilities of the parties as set forth in this "written contract".  Although plaintiff is not required to plead detailed facts to state a breach of contract, he still must plead sufficient facts concerning the general nature of this "written contract" in order to give proper notice to the defendant as to what contract it allegedly breached.  *See*, <u>Bakhtiari</u>, at *5; <u>iCARD Stored Value Solutions LLC v. West Suburban Bank</u>, 2008 WL 619236, *6 (E.D.Mo. March 3, 2008).  Plaintiff simply makes vague allegations that "pursuant to a written contract", he has "given up the right to seek employment while enrolled at SLU and has agreed to concentrate on his studies" while this "written contract" requires defendant SLU to "abide by laws pertaining to physical disabilities and to assist and accommodate the Plaintiff".  Plaintiff's Complaint [1], ¶133.  Notwithstanding the fact that plaintiff has failed to provide any factual support for his purported "right to seek employment while enrolled at SLU"[5]; the only "consideration" for plaintiff giving up this "right" is SLU's adherence to federal and/or state discrimination laws.  Abiding by discrimination laws cannot be consideration for any contract, even this unidentified "written contract".  <u>Miller</u>, *supra.*; <u>Doran</u>, *supra.*

      So, while plaintiff alludes to a "written contract", he fails to identify it with sufficient specificity and only makes vague allegations that it exists and that defendant breached it by failing

---

     [5]The Court is a bit perplexed as to the nature or genesis of such a right under either Missouri state law or federal law.

25

to accommodate him.  Plaintiff Doe has failed to identify this "written contract" with sufficient specificity as required by <u>Twombly</u>.  Furthermore, the only "consideration" alleged for this contract is the defendant's adherence to federal and/or state discrimination laws which, under Missouri law, cannot constitute consideration for a valid and enforceable contract.

Plaintiff's attempt to circumvent his Count V's explicit allegation of the existence of a "written contract" by now claiming that an "oral contract" exists between the parties and/or that a "student handbook" encompasses the parties' contractual relationship fails for the same reasons.  Again, plaintiff only makes vague allegations without providing any factual support for these new allegations.  He fails to set forth even minimal facts describing the nature of this "oral contract" or the terms of the rights and obligations of the parties as defined by this "oral contract".  He simply reiterates that as long as he was enrolled and attended medical school, defendant was obligated to abide by all discrimination laws.  Plaintiff's Response [16], pgs. 11-12.  Such allegations are still too vague to meet the requirements of <u>Twombly</u>, and he still alleges the only consideration is the defendant's adherence to all discrimination laws which, again, cannot serve as consideration for a valid and enforceable contract.

As for the "student handbook", plaintiff fails to identify this "student handbook" with any specificity; i.e. he fails to identify it as the student handbook for all SLU students or a student handbook for SLU medical students only.  He fails to allege the specific provisions within this unidentified student handbook which required the defendant to take any of the actions that plaintiff contends that defendant failed to take, and which entitles plaintiff to the relief he seeks. *See*, <u>Cento</u>, at \*3 (plaintiff's vague allusion to an insurance policy without alleging the specific terms of the policy which defendant allegedly breached fails to state a claim for breach of contract under Missouri law).

Finally, it is unclear as to whether plaintiff is making a separate claim for breach of the duty of good faith and fair dealing since he makes only a vague reference that the "written contract" had a "covenant of good faith and fair dealing".  Plaintiff's Complaint [1], ¶133.  He further alleges that "[A]n agreement between the parties existed and the Defendant SLU breached the agreement and it duty of good faith and fair dealing by wrongfully and arbitrarily failing to assist the Plaintiff with his disability . . .".  Plaintiff's Complaint [1], ¶135.

To establish a violation of the covenant of good faith and fair dealing, "the plaintiff must show that the party exercised its discretion `in such a manner as to evade the spirit of the transaction or so as to deny [the other party] the expected benefit of the contract.'".  Midwest Special Surgery, at *7 *quoting* BJC Health Sys. v. Columbia Cas. Co., 478 F.3d. 908, 914 (8th cir. 2007)(*quoting* Mo. Consol. Health Care Plan v. Cmty. Health Plan, 81 S.W.3d. 34, 45 (Mo.App. 2002).  A claim for breach of the covenant of good faith and fair dealing necessitates the existence of a contract.  Midwest Special Surgery, at *7 *citing* Danella Southwest, Inc. v. Southwestern Bell Tel. Co., 775 F.Supp. 1227, 1236 (E.D.Mo. 1991).  Since plaintiff has failed to properly allege the existence of a contract, written or otherwise, his claim for breach of the covenant of good faith and fair dealing cannot survive.  Thus, as far as Count V's claim for breach of covenant of good faith and fair dealing, it too must be dismissed for failure to state a claim upon which relief can be granted.

Count V of the plaintiff's complaint, and his attempt to "clarify" fail to set forth factual allegations specific enough to raise his claim beyond the speculative level.  Based upon the standard articulated in Twombly and its progeny, and based upon Missouri substantive law regarding the elements of a breach of contract claim, plaintiff Doe has failed to state a claim for breach of contract.

In summary, plaintiff has failed to state a claim for failure to accommodate under both the ADA and the Rehabilitation Act; and has failed to state a claim for breach of contract under Missouri law.

Dated this ___28th___ day of March, 2013.

_____
UNITED STATES DISTRICT JUDGE